Asim Dietrich (Arizona Bar No. 027927)
Rose Daly-Rooney (Arizona Bar No. 015690)
ARIZONA CENTER FOR DISABILITY LAW
5025 E. Washington Street, Suite 202
Phoenix, AZ 85034
Telephone:   (602) 274-6287
Facsimile:   (602) 274-6779
E-mail:       adietrich@azdisabilitylaw.org
              rdalyrooney@azdisabilitylaw.org

Debra Patkin (Admitted to Maryland Bar[1]) (Pro Hac Vice to be filed)
NATIONAL ASSOCIATION OF THE DEAF, LAW AND ADVOCACY CENTER
8630 Fenton Street, Suite 820
Silver Spring, Maryland 20910
Telephone:   (301) 587-1788
Facsimile:   (301) 587-1791
E-mail:       debra.patkin@nad.org

Michael Stein (Massachusetts Bar No. 668992) (Pro Hac Vice to be filed)
Mary Vargas (Admitted to Maryland Bar) (Pro Hac Vice to be filed)
STEIN & VARGAS, LLP
5100 Buckeystown Pike, Suite 250
Frederick, Maryland 21704
Telephone:   (202) 510-9553
Facsimile:   (888) 778-4620
E-mail:       michael.stein@steinvargas.com
              mary.vargas@steinvargas.com

*Attorneys for Plaintiffs*

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

---

[1]       Maryland does not issue bar numbers. See  http://www.courts.state.md.us/lawyers

| | |
|---|---|
| 1 | Case No. |
| 2    NORBERT ENOS; TERRI GUY; JULIAN | COMPLAINT |
| 3    SINGLETON; and NATIONAL ASSOCIATION OF THE DEAF; | |
| 4      PLAINTIFFS, | |
| 5   vs. | |
| 6   STATE OF ARIZONA; ARIZONA | |

NORBERT ENOS; TERRI GUY; JULIAN
SINGLETON; and NATIONAL ASSOCIATION
OF THE DEAF;

   PLAINTIFFS,

vs.

STATE OF ARIZONA; ARIZONA
DEPARTMENT OF ADMINISTRATION;
CRAIG BROWN, in his official capacity as
Director of the Arizona Department of
Administration; ARIZONA DEPARTMENT OF
ADMINISTRATION- ARIZONA STRATEGIC
ENTERPRISE TECHNOLOGY OFFICE;
MORGAN REED, in his official capacity as State
Chief Information Officer for the State of Arizona;
BARBARA JAEGER, in her official capacity as
State 911 Administrator for the State of Arizona;
ELIZABETH GRAEBER, in her official capacity
as Public Safety Answering Point Administrator
for Maricopa County, Arizona; MARICOPA
ASSOCIATION OF GOVERNMENTS; W.J.
LANE, in his official capacity as Chair of the
Maricopa Association of Governments Regional
Council; DOMELA FINNESSEY, in her official
capacity as Chair of the Maricopa Association of
Governments - Public Safety Answering Point
Managers Group; JAY STREBECK, in his official
capacity as Chair of the Maricopa Association of
Governments - 911 Oversight Team; MARICOPA
COUNTY SHERIFF'S OFFICE; JOSEPH
ARPAIO, in his official capacity as Sheriff of
Maricopa County, Arizona; CITY OF SURPRISE
POLICE DEPARTMENT in Surprise, Arizona;
and TERRY YOUNG, in his official capacity as
Chief of Police for the City of Surprise, Arizona,
DEFENDANTS.

Case No.

COMPLAINT

## **INTRODUCTION**

In the State of Arizona, Maricopa County, and the City of Surprise, a person who is deaf or hard of hearing cannot contact 911 via text and as a result is in many circumstances wholly unable to access 911 services that are critically necessary and available to individuals without disabilities. A person who is deaf or hard of hearing in Arizona cannot report a crime, a fire, a motor vehicle accident, or a medical emergency directly via text, with the result that such individuals are at substantial risk and face crucial delays in accessing emergency services. Likewise, individuals with other disabilities that impact speech and communication are unable to access 911 services directly via text.

The failure to make 911 accessible to individuals with such disabilities violates both Title II of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12131 *et seq.*, and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794. Thus, Plaintiffs seek direct, immediate, and equal access to emergency 911 services through the activation of existing text-to-911 technology.

## **JURISDICTION AND VENUE**

1.  This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343, as this case is brought pursuant to Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131 *et seq.*, and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794.

2.   Venue is proper in the District of Arizona pursuant to 28 U.S.C. § 1391 because: (1) Plaintiffs and members of the National Association of the Deaf reside in the District; (ii) Defendants have sufficient contacts within this District to subject it to personal jurisdiction; and (iii) the acts and omissions giving rise to this Complaint occurred within this District.

## **PARTIES**

### Plaintiffs

3.   Plaintiff, the National Association of the Deaf (hereinafter, "NAD"), is a national non-profit civil rights organization of, by, and for individuals who are deaf and hard of hearing, including but not limited to the estimated 82,224 deaf and hard of hearing individuals between 18 and 64 years old that live in Arizona.[2]

A.   Established in 1880, the NAD is based in Silver Spring, Maryland with individual and organization members in all fifty states and Washington, DC.

B.   The NAD has members throughout the State of Arizona and in Maricopa County and the City of Surprise.

C.   The NAD has an Arizona affiliate, the Arizona Association of the Deaf ("AzAD").

---

[2]   http://libguides.gallaudet.edu/content.php?pid=119476&sid=1029190

4

D.  The NAD is devoted to the goal of full inclusion, equality, and civil rights for its members, who are deaf and hard of hearing individuals, and their families.

E.  The NAD's membership includes individuals who are substantially limited in the major life activities of hearing and/or speaking.  The NAD has associational standing to sue on behalf of its deaf and hard of hearing members because the NAD has members residing in Maricopa County, including Surprise, who are being discriminated against by Defendants who are not providing these members with direct, immediate and equal access to their 911 services.  Such members have standing to sue Defendants on their own.  Advocating on behalf of its members on this issue is germane to the NADs mission of advocating for its members rights to full and equal access to society. Finally, none of the NAD's members will be required to participate in this action because the NAD is seeking declaratory and injunctive relief, and not an individualized remedy for its members.

4.  Plaintiff, Norbert Enos, resides in Surprise, Arizona, which is in Maricopa County. He is and has been deaf since birth. Thus, Norbert Enos is a person with a physical impairment that substantially limits at least one major life activity, including, but not limited to, hearing and speaking. As such, Norbert Enos is and

has been a qualified individual with a disability as defined by the Americans with Disabilities Act and the Rehabilitation Act of 1973.

5. Plaintiff, Terri Guy, resides in Tempe, Arizona which is in Maricopa County. She is and has been hard of hearing since birth. In addition, she has been diagnosed with diabetes and multiple sclerosis. Thus, Terri Guy is a person with a physical impairment that substantially limits at least one major life activity, including, but not limited to, hearing and speaking. As such, Terri Guy is and has been a qualified individual with a disability as defined by the Americans with Disabilities Act and the Rehabilitation Act of 1973.

6. Plaintiff, Julian Singleton, resides in Surprise, Arizona which is in Maricopa County. He is and has been deaf since birth. Thus, Julian Singleton is a person with a physical impairment that substantially limits at least one major life activity, including, but not limited to, hearing and speaking. As such, Julian Singleton is and has been a qualified individual with a disability as defined by the Americans with Disabilities Act and the Rehabilitation Act of 1973.

7. Defendant, the State of Arizona, through the Arizona Department of Administration ("ADOA"), among other responsibilities, collects revenues and disburses funds to the Arizona Strategic Enterprise Technology Office ("ADOA-ASET") in order to implement and operate 911 emergency telecommunication services throughout Arizona. Defendant is a recipient of federal financial

assistance. Defendant ADOA's business address is 100 N. 15th Ave., Phoenix, AZ 85007.

8. Defendant, Craig Brown, is the Director of the ADOA.

9. Defendant, ADOA-ASET, operates and oversees the statewide 911 program that provides access to emergency services for all individuals in Arizona. Among other responsibilities, the ADOA-ASET oversees the revenues that are collected through the Emergency Telecommunication Service Revolving Fund and oversees the statewide 911 program's network and equipment. In addition, ADOA-ASET oversees the Public Safety Answering Point ("PSAP") regions throughout Arizona.  When an individual dials 911, a local PSAP answers the telephone call. Arizona's PSAPs are organized by county into various PSAP regions. There are 18 PSAP regions in Arizona, and ADOA-ASET oversees each PSAP region. Maricopa County is the largest PSAP region in Arizona. Defendant is a recipient of federal financial assistance. Defendant ADOA-ASET's business address is 100 N. 15th Ave., Suite 400, Phoenix, AZ 85007.

10. Defendant, Morgan Reed, is the Chief Information Officer for the State of Arizona, and, upon information and belief, oversees ADOA-ASET.

11. Defendant, Barbara Jaeger, is the State 911 Administrator for the State of Arizona.

12. Defendant, Elizabeth Graeber, is the Public Safety Answering Point System Administrator for the Maricopa County, Arizona PSAP region.

13.   Defendant, Maricopa Association of Governments, through its Public Safety Answering Point Managers Group and 911 Oversight Team, is responsible for, among other things, overseeing the technical needs and providing overall coordination of the approximately 23 PSAPs in the Maricopa County region. Defendant is a recipient of federal financial assistance. Defendant Maricopa Association of Governments' business address is 302 N. 1st Ave., Suite 300, Phoenix, AZ 85003.

14.   Defendant, W.J. Lane, is Chair of the Maricopa Association of Governments Regional Council, which is the governing and policy-making body of the Maricopa Association of Governments.

15.   Defendant, Domela Finnessey, is Chair of the Maricopa Association of Governments - Public Safety Answering Point Managers Group.

16.   Defendant, Jay Strebeck, is Chair of the Maricopa Association of Governments - 911 Oversight Team.

17.   Defendant, the Maricopa County Sheriff's Office (MCSO) operates one PSAP in the Maricopa County, Arizona PSAP region. The MCSO PSAP answers 911 calls that originate in areas within MCSO's jurisdiction. Defendant is a recipient of federal financial assistance. Defendant MCSO's business address is 550 West Jackson St., Phoenix, AZ 85003. Upon information and belief, the name and business address of MCSO's designated representative is Maricopa County

Attorney Bill Montgomery, Maricopa County Attorney's Office, 301 West Jefferson St., Suite 800, Phoenix, AZ 85003.

18. Defendant, Joseph Arpaio, is the Sheriff of Maricopa County and oversees MCSO.

19. Defendant, the Surprise Police Department in Surprise, Arizona, operates a PSAP that provides emergency telecommunications services for individuals who call 911 within the jurisdiction of the city of Surprise, Arizona. Defendant is a recipient of federal financial assistance. Upon information and belief, the name and business address of Defendant Surprise Police Department's designated representative is Harold Brady, Police Legal Advisor, 14250 W. Statler Plaza, Suite 103, Surprise, AZ 85374.

20. Defendant, Terry Young, is the Chief of Police for the City of Surprise, Arizona.

## STATEMENT OF FACTS

21. In the State of Arizona, Maricopa County, and the City of Surprise, individuals without disabilities can use standard telephones, wireless mobile phones, and voice over internet protocol ("VoIP") to dial 911 and receive immediate access to emergency medical, fire, and police services provided by Defendants.

22. However, numerous individuals with different types of disabilities in the State of Arizona, Maricopa County and the City of Surprise cannot contact 911 directly because Defendants, as public entities that receive federal financial assistance,

have failed to provide these individuals with the same, direct, immediate, and equal access to 911 emergency services.

23. For example, individuals with disabilities that prevent them from being able to hear, speak, or otherwise communicate via a standard telephone, such as individuals with deafness, autism, cerebral palsy, multiple sclerosis, Parkinson's, anxiety disorders, traumatic brain injuries and speech disabilities in many circumstances have no direct access or no access at all to 911.

24. Deaf and hard of hearing individuals, including NAD members, cannot use the standard telephone because they are unable to hear and/or speak over the telephone.

25. Because Defendants do not accept 911 text messages, the only ways that deaf and hard of hearing individuals can attempt to contact 911, are either by using a telecommunications relay service or by using a nearly obsolete device called a teletypewriter ("TTY", also known as telecommunications device for the deaf, or "TDD").

26. Telecommunication Relay Services ("TRS") are services that allow individuals who are deaf, hard of hearing, deaf-blind, or have a speech disability to place calls to standard telephone users via communication devices such as videophones, captioned telephones, or internet devices such as computers, tablets, and smartphones. Relay services calls are accomplished through the use of

communication assistants ("CAs") such as sign language interpreters or captionists.

27.  The user initiates a relay services call by dialing the desired number. The call will then connect to a CA who places an outbound standard telephone call to the called party, serves as an intermediary for that call by voicing the user's typed or signed words to the called party, converts the called party's spoken words into text or American Sign Language ("ASL"), and then relays those words back to the user.

28.  Even then, relay services are highly dependent on factors such as bandwidth, the availability of an internet connection or cellular signal, as well as the caller's location.

29.  Many individuals who are deaf or hard of hearing, or who have speech disabilities do not have the communications devices or the internet connection necessary to place relay calls. Furthermore, many deaf or hard of hearing individuals who do have communications devices such as videophones may not be able to place relay calls during times of emergency when they lose internet connection, lose wireless signal, have insufficient bandwidth, or are not home.

30.  Relay services are also available only to individuals who are deaf, hard of hearing, or have speech disabilities. Thus, individuals with other types of disabilities that prevent them from being able to use a standard telephone to call 911, also do not have access to relay services.

31. PSAPs are required to have TTYs, which are electronic devices with a keyboard that is used for text communication over a standard telephone line, and which were historically a way for deaf individuals to communicate over telephone lines.

32. However, modern technology has rendered the TTY nearly obsolete. While a small population of deaf and hard of hearing individuals still use the TTY for telecommunication purposes, a significant majority of deaf and hard of hearing individuals do not own TTYs anymore and, instead, use technology such as email and texting to communicate.[3]

33. Many individuals with different types of disabilities do not own a TTY and/or find it impractical for their telecommunication needs.

34. Consequently, even PSAPs with TTYs remain inaccessible to individuals with disabilities, including individuals who are deaf or hard of hearing.

35. As a result of the inaccessibility of Defendants' telephone emergency services, Plaintiffs, NAD members, and other individuals with disabilities throughout the State of Arizona and in Maricopa County as well as the City of Surprise have the substantial likelihood of encountering emergencies without the ability to contact 911 for immediate assistance.

---

[3] FCC Emergency Access Advisory Committee Report on TTY Transition, released March 11, 2013, available at https://www.fcc.gov/document/emergency-access-advisory-committee-eaac-report-tty-transition

36. Without the ability to text 911, many senior citizens with disabilities who are at increased risk for health issues will find it impossible to contact 911 and get help. They live in fear of what will happen if and when a catastrophic health incident strikes and there is no one with them who is hearing and can call 911.

37. Many individuals with disabilities are also caregivers to family members with health issues, or have companions that are at increased risk for health issues likely to require emergency medical care. Those individuals need immediate, direct access to 911.

38. Plaintiff, Norbert Enos, is deaf and uses ASL and TRS to communicate. He lives in fear of being away from his home and experiencing an emergency without any way of accessing 911. Mr. Enos can use TRS on his smartphone when his smart phone has an Internet connection. However, when he does not have an Internet connection on his smartphone, 911 services are completely inaccessible to Mr. Enos.

39. In addition, Plaintiff, Norbert Enos, is 70 years old. Because the likelihood of a catastrophic health emergency increases as individuals age, Mr. Enos lives in fear of what will happen if and when a catastrophic health incident strikes and there is no one with him who is hearing and can call 911.

40. Mr. Enos' wife may also encounter a health emergency and require the assistance of Mr. Enos to obtain emergency services. Without the ability to send a text to

13

911, Mr. Enos would be unable to access 911 and obtain emergency services for his wife.

41. Plaintiff, Julian Singleton, is deaf and uses ASL to communicate.  He is a member of the NAD.

42. Mr. Singleton has twice called 911 through TRS when his wife experienced medical emergencies.  Both times, he was home with the high-speed internet connection necessary to use TRS.  Mr. Singleton also has a smartphone that allows him to use TRS when there is access to a high-speed internet connection. However, Mr. Singleton fears a time when he will have to contact 911 again, and he will not be home, or in a location with ready access to the high-speed internet connection necessary for a TRS call.

43. Mr. Singleton and his spouse, who is also deaf, are senior citizens and it is reasonably foreseeable that one or both will experience a medical emergency that will require contacting 911 again in the future.

44. Both Mr. Enos and Mr. Singleton reside in Sun City Grand, a senior citizen community in Surprise, Arizona with approximately 50 other deaf individuals.  It is reasonably foreseeable that Mr. Enos or Mr. Singleton may need to contact 911 not only for themselves or their spouses but also for their deaf friends and neighbors.

45.   Plaintiff, Terri Guy, is hard of hearing and depends on lip reading, email, and text to communicate. Ms. Guy is unable to access the Arizona 911 system because she is unable to communicate effectively over telephone. Therefore, Ms. Guy would be unable to hear and understand a 911 operator via a standard telephone.

46.   Plaintiff, Terri Guy, has diabetes and has called 911 in the past when her blood glucose level has been dangerously high. However, Ms. Guy was not able to effectively communicate with the 911 operator. Ms. Guy was able to discern that the 911 operator was asking questions, but Ms. Guy's hearing disability prevented her from understanding the 911 operator. As a result, Ms. Guy was unable to equally access emergency services through the 911 system.

47.   Plaintiff, Terri Guy, continues to have a diagnosis of diabetes, making it highly likely that she will need to access emergency services and the 911 system during a future diabetic incident.

48.   Plaintiff, Terri Guy, also has a diagnosis of multiple sclerosis. This diagnosis often causes Ms. Guy difficulty in speaking clearly. If Ms. Guy has a medical emergency related to multiple sclerosis, Arizona's current 911 system is inaccessible to Ms. Guy to obtain emergency services.

49.   While a person without disabilities can contact 911 by telephone or cell phone if they were to suffer a heart attack or other medical emergency while away from

home, an individual who is deaf cannot contact 911 to report the emergency and seek help due to the PSAP not accepting text messages.

50. While a person without disabilities who witnesses a crime or is the victim of a crime can call 911 using a telephone or cell phone, an individual who is deaf in those same circumstances may not be able to contact 911 to report the emergency and seek help.[4]

51. While a person without disabilities can call if 911 from a cell phone in the event of a fire or gas leak, an individual who is deaf may not be able to contact 911 to report the emergency and seek help.

52. In addition to the inaccessibility of 911 services for people who are deaf and hard of hearing, the current 911 system in Arizona is also inaccessible for persons with other disabilities that impair their speech. For example, individuals with cerebral palsy often have speech impairments that make speaking during times of emergency extremely difficult or even impossible, making 911 services in Arizona inaccessible to the person with cerebral palsy.

53. Persons with Parkinson's disease often have difficulty speaking clearly during times of emergency, making 911 services in Arizona inaccessible to individuals with Parkinson's disease that causes speech impairments.

---

[4] Defendants failure to provide access to the 911 system via text message also prevents individuals both with and without disabilities from inaudibly reporting a crime when it would be impossible or too dangerous to report a crime verbally.

54.  Many people with autism are completely nonverbal and are unable to speak at any time, including during an emergency. 911 services in Arizona are inaccessible for people with autism and many other disabilities that may impact speech and communication.

55.  Because Defendants do not accept 911 text messages, individuals with these other types of disabilities that prevent them from using a standard telephone to call 911, have no way to contact 911 and access emergency services.  Due to this total lack of access, these individuals live in fear and uncertainty about what will happen if they suffer a life-threatening emergency, particularly if they are away from home or traveling. They do not enjoy the benefit of 911 emergency access that is readily available to individuals without disabilities.

56.  Parents with disabilities are also likely to need 911 emergency services for their children.  For instance, if an infant or toddler is choking on a foreign object lodged in the child's throat, suffers an allergic reaction, or otherwise suffers an injury, the parent needs to be able to quickly contact 911 to summon help.

57.  These are just a few examples of how the inaccessibility of Defendants' 911 emergency services places individuals with a disability, their family members, and their companions at greater risk than individuals without a disability.

58.  As a result of Defendants' failure to implement text-to-911 services, Plaintiffs, NAD members, and other individuals with disabilities do not have direct, equal,

reliable, and immediate access to emergency 911 services including medical, fire, and police services. It is foreseeable that individuals with disabilities may be severely injured or die, or suffer additional injury or property loss due to the inability to access 911.

<u>Arizona's Current 911 System</u>

59.    Defendants operate Public Safety Access Points ("PSAPs" or individually, "PSAP") in Arizona that accept 911 telephone calls. These PSAPs gather information about the emergency as it unfolds and also arrange for emergency services including the dispatch of police, fire, and/or medical services.

60.    The State of Arizona Department of Administration ("ADOA") and ADOA-Arizona Strategic Enterprise Technology Office ("ADOA-ASET") oversee the funding and operations of all PSAPs.

61.    The State of Arizona has approximately 76 PSAPs spread out across 18 regions with an administrator for each region.[5]

62.    Upon information and belief, these PSAPs are operated by police departments, sheriff's offices, fire departments, or similar public entities.

63.    Arizona's PSAPs are funded by the Emergency Telecommunication Service Revolving Fund ("ETSRF"), which collects revenues from a small percentage of prepaid wireless retail sales as well as the Telecommunications Services Excise

---

[5]    https://aset.az.gov/public-safety-admins

Tax, which imposes a surcharge of $0.20 per month on each landline, wireless, and VoIP service account. [6]

64.    ADOA-ASET has oversight over the ETSRF. Upon information and belief, ADOA-ASET is responsible for adopting rules and procedures for administering and disbursing ETSRF funds, reviewing and approving payment requests by PSAPs, establishing operating procedures for the expedient and appropriate processing of 911 calls, and requiring service plans of all PSAPs to address redundancy and business continuity issues.[7]

65.    Upon information and belief, the ETSRF's collected revenues are used to implement and operate 911 services throughout Arizona. 911 network costs, administration costs, consulting services, station terminal equipment, and equipment maintenance costs are all eligible for funding from the ETSRF. [8]

66.    According to the State of Arizona 911 program, there are an estimated 2.2 million access lines and 4.3 million wireless subscribers in the State of Arizona.[9] At $0.20 per month for 6.5 million lines, revenues would total approximately $1.3 million per month, which does not include revenues from prepaid wireless retail sales.

---

[6]    https://aset.az.gov/arizona-911-program

[7]    A.R.S. § 41-704(A)(1).

[8]    https://aset.az.gov/what-costs-are-eligible-funding-emergency-telecommunication-services-revolving-fund

[9]    Arizona 911 Program, Overview. https://aset.az.gov/arizona-9-1-1-program

67. The State of Arizona makes policy decisions including what capabilities PSAPs operated by local government agencies must have and whether they must accept texts to 911.

68. Defendant Maricopa Association of Governments provides oversight and technical assistance to the PSAPs in the Maricopa County region. Upon information and belief, none of the PSAPs in Maricopa County accept texts to 911.

69. The City of Surprise operates a PSAP. The PSAP does not accept texts to 911.

70. Upon information and belief, Defendants have the authority to order text to 911 systems for PSAPs, including in Maricopa County and the City of Surprise.

71. However, not a single PSAP in Arizona has a text-to-911 system in place.

72. As a result, Plaintiffs and numerous individuals with different types of disabilities that prevent them from making standard telephone calls, cannot directly access 911.

73. Thus, Defendants have discriminated and continue to discriminate against Plaintiffs and other individuals with different types of disabilities by failing to provide them with direct access to its 911 emergency services.

How Text-to-911 Systems Work

74. With text-to-911 systems, an individual can send a text message to 911 instead of using a standard telephone to call 911.

75.   The Federal Communications Commission ("FCC") requires telephone service providers to ensure that users have the capability to send 911 text messages to PSAPs that accept them.[10] FCC implemented this mandate "because of the unique value of text-to-911 for the millions of Americans with hearing or speech disabilities."[11]

76.   The FCC maintains a registry of PSAPs with text-to-911 systems.[12] None of the listed PSAPs are in Arizona, but PSAPs in many other states are listed as accepting texts to 911.

77.   On August 13, 2014, the FCC promulgated a regulation requiring all telephone service providers to begin routing 911 text messages to PSAPs by the later of (1) June 30, 2015, or (2) within six months of a PSAP's valid request for text-to-911 service. *See* 47 C.F.R. § 20.18(q)(10).

78.   The four largest telephone service providers – AT&T, Sprint, T-Mobile, and Verizon – are all capable of routing text messages to PSAPs.

---

[10]   https://www.fcc.gov/text-to-911

[11]   79 F.R. 55367-02

[12]   https://transition.fcc.gov/pshs/911/Text911PSAP/Text_911_Master_PSAP_Registry.xlsx

79. To establish text-to-911 capability, a PSAP must have agreed to accept 911 text messages from the public. Specifically, the PSAP must notify telephone service providers that it wishes to accept text messages. The telephone service providers will then set up the service at no charge to the PSAP.

80. For PSAPs that do not accept text messages, the FCC requires the telephone service provider to send a bounce-back message informing the sender that text-to-911 service is not available and to use another means to contact 911. *See* 47 C.F.R. § 20.18(q)(3), (5).

81. PSAPs have three options for setting up text-to-911 services: (1) web-based text-to-911 systems; (2) IP-based text-to-911 systems, and (3) accepting 911 text messages via TTY.

82. First, a PSAP can set up a web-based text-to-911 system which accepts text messages through a website. This method requires the PSAP to have internet access. If the PSAP already has internet access, then the service can be set up to communicate with texters via a website.

83. Second, a PSAP can upgrade to Next Generation 911 ("NG911")[13], an IP-based text-to-911 system that allows individuals to send digital information such as voice, text messages, photos, and videos to 911. Upgrading to NG911 requires the

---

[13]  http://www.911.gov/911-issues/standards.html;

PSAP to have IP-capable equipment and IP connectivity. Once a PSAP upgrades to NG911, this system can be configured to accept 911 text messages.

84. Third, in the interim, if a PSAP does not have either internet access or IP-capable equipment and connectivity, it can use a TTY to accept text messages. U.S. Department of Justice regulations already require PSAPs to have TTYs. 28 C.F.R. § 35.162.

85. PSAPs can use their existing TTYs to accept text messages as a stopgap measure until either a web-based or IP-based text-to-911 system is implemented.

86. The United States Department of Justice has issued a letter stating that "PSAPs must accept a call from a person with a hearing or speech disability that originates as an SMS call [(text message)], but reaches the PSAP as a TTY call." *See* Exhibit A.

87. The Department of Justice has further stated that if the PSAP chooses to use a web portal or NG911 to accept a text message, then that would be an equally effective way to communicate with an individual who is deaf or hard of hearing. *See id.*

88. Despite the multiple options available for accepting 911 text messages and communicating with texters during an emergency, Defendants have not instituted any system for communicating with individuals who text 911, including individuals with a disability who cannot contact 911 using the standard telephone.

# STATEMENT OF CLAIMS

## Count I. Title II of the Americans with Disabilities Act
## 42 U.S.C. § 12131 *et seq.*

89.  Plaintiffs repeat and reallege all preceding paragraphs in this Complaint.

90.  On July 26, 1990, Congress enacted the Americans with Disabilities Act ("ADA") to "provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1).

91.  Congress enacted the ADA to remedy various forms of discrimination experienced by individuals with disabilities, including "communication barriers" such as the inability to access 911 services. 42 U.S.C. § 12101(a)(5).

92.  Congress enacted the ADA to also assure persons with disabilities "full participation" in their community, such as the ability to report accidents, crimes, and other emergencies through a 911 program that is accessible to persons with disabilities. 42 U.S.C. § 12101(a)(7).

93.  Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

94.  Title II of the ADA defines "qualified individual with a disability" as "an individual with a disability who, with or without reasonable modifications to

rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C. § 12131(2).

95.   Members of the NAD are substantially limited in the major life activities of hearing and speaking. Accordingly, they are considered individuals with a disability as defined by the ADA.  42 U.S.C. § 12102(2).

96.   Norbert Enos is a qualified individual with a disability as defined by the ADA. 42 U.S.C. § 12102(2).

97.   Terry Guy is a qualified individual with a disability as defined by the ADA. 42 U.S.C. § 12102(2).

98.   Julian Singleton is a qualified individual with a disability as defined by the ADA. 42 U.S.C. § 12102(2).

99.   Title II of the ADA applies to state and local government entities and protects qualified individuals with disabilities from discrimination on the basis of disability in services, programs, and activities provided by state and local government entities. 42 U.S.C. §§ 12131-12132.

100.   Defendants are public entities within the meaning of the ADA because they are state and local government entities that provide services, programs, and activities. 42 U.S.C. § 12131(1)(B).

101. Pursuant to Title II of the ADA and its implementing regulations, public entities are required "to take appropriate steps to ensure that communications with applicants, participants, members of the public, and companions with disabilities are as effective as communications with others". 28 C.F.R. § 35.160(a)(1).

102. Pursuant to Title II of the ADA and its implementing regulations, in order to achieve effective communication, public entities are to furnish appropriate auxiliary aids and services. 28 C.F.R. § 35.160(b)(1).

103. The legislative history of the ADA indicates Congress' intention that, through the advancement of technology, more effective types of auxiliary aids and services would be provided by public entities to persons with disabilities.[14]

104. Under Title II and its implementing regulations, public entities such as ADOA and the 18 PSAP regions must give "primary consideration" to the requests of individuals with a disability in determining which auxiliary aid to use. 28 C.F.R. § 35.160(b)(2).

105. Defendants have discriminated and continue to discriminate against Plaintiffs on the basis of their disability by denying Plaintiffs equal access to the services,

---

[14] The Committee wishes to make it clear that technological advances can be expected to further enhance options for making meaningful and effective opportunities available to individuals with disabilities... Indeed, the Committee intends that the types of accommodation and services provided... [under the ADA] should keep pace with the rapidly changing technology of the times. H.R. Rep. 101-485(II), at 108 (1990).

programs, and benefits offered to others because Defendants' 911 emergency services are inaccessible to individuals with a disability, in violation of Title II of the ADA.

106.   Defendants are required by the ADA to provide individuals with disabilities equal access to 911 services as it provides to non-disabled individuals. Specifically, Defendant must provide individuals with a disability with direct access to 911 by furnishing the appropriate auxiliary aids and services that would enable such direct access, including accepting text messages from individuals with a disability.

107.   Thus, Defendants have failed to meet their obligations to provide individuals with disabilities with access to 911 services that is equal to that provided to individuals without disabilities.

108.   Defendants have discriminated, and continue to discriminate, against Plaintiffs on the basis of their disability in violation of Title II of the ADA.

<u>Count II. Section 504 of the Rehabilitation Act of 1973</u>
29 U.S.C. § 794

109.   Plaintiffs repeat and reallege all preceding paragraphs in this Complaint.

110.   Section 504 states that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of his or her disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination

under any program or activity receiving Federal financial assistance . . ." 29 U.S.C. § 794.

111.    NAD members are substantially limited in the major life activities of hearing and speaking. Accordingly, they are individuals with a disability as defined under Section 504, as amended. 29 U.S.C. § 705(20)(B).

112.    Norbert Enos is a qualified individual with a disability as defined by Section 504, as amended. 29 U.S.C. § 705(20)(B).

113.    Terry Guy is a qualified individual with a disability as defined by Section 504, as amended. 29 U.S.C. § 705(20)(B).

114.    Julian Singleton is a qualified individual with a disability as defined by Section 504, as amended. 29 U.S.C. § 705(20)(B).

115.    At all relevant times, Defendants were and continue to be recipients of federal financial assistance within the meaning of 29 U.S.C. § 794(b)(1).

116.    Defendants have discriminated and continue to discriminate against Plaintiffs on the basis of their disability by denying Plaintiffs equal access to the services, programs, and benefits offered to others because Defendants' 911 emergency services are inaccessible to individuals with a disability, in violation of Section 504.

# **RELIEF REQUESTED**

Wherefore, Plaintiffs respectfully request that this Court:

A.    Issue a declaratory judgment that Defendants' policies, procedures, and practices have and continue to subject Plaintiffs to discrimination in violation of Title II of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act of 1973.

B.    Order Defendants to implement text-to-911 services in Defendants' PSAPs.

C.    Enjoin Defendants from implementing or enforcing any policy, procedure, or practice that denies individuals with a disability, such as Plaintiffs, equal access to and an equal opportunity to participate in and benefit from Defendants' programs, activities or services.

D.    Enjoin Defendants from implementing or enforcing any policy, procedure, or practice that limits or restricts individuals who are deaf or hard of hearing, such as Plaintiffs, from using text messages to communicate with Defendants' PSAPs.

E.    Order Defendants to develop and comply with policies, procedures, and practices to ensure that Defendants are able to communicate with individuals with a disability who contact PSAPs using text messages.

F.    Order Defendants to train all representatives and employees on the rights of individuals with a disability under the Americans with Disabilities Act and

Section 504, as well as provide training on Defendants' policies and procedures for accepting text messages to 911.

G.    Award to Plaintiffs attorney's fees and costs incurred in bringing this action.

H.    Award any and all other relief that this Court may deem necessary and appropriate.

Dated this 11th day of February, 2016.

*/s/ Asim Dietrich*
Asim Dietrich
Rose A. Daly-Rooney
Arizona Center for Disability Law
5025 E. Washington St., Suite 202
Phoenix, Arizona 85034

Debra Patkin
National Association of the Deaf
Law and Advocacy Center
8630 Fenton Street, Suite 820
Silver Spring, Maryland 20910
*Application for *pro hac vice* pending

Michael S. Stein
Mary C. Vargas
Stein & Vargas, LLP
5100 Buckeystown Pike, Suite 250
Frederick, Maryland 21704
*Application for *pro hac vice* pending

*Attorneys for Plaintiff*

**U.S. Department of Justice**

Civil Rights Division

*Counsel to the Assistant Attorney General*
*950 Pennsylvania Ave, NW - RFK*
*Washington, DC 20530*

March 8, 2013

**VIA ELECTRONIC FILING**

Ms. Marlene H. Dortch
Office of the Secretary
Federal Communications Commission
445 12th Street, S.W.
Washington D.C. 20554

> Re: In the Matter of Facilitating the Deployment of Text-to-911 and Other Next Generation 911 Applications; Framework for Next Generation 911 Deployment, PS Docket No. 11-153, PS Docket 10-255, *Further Notice of Proposed Rulemaking*, FCC 11-134, 26 FCC Rcd 13615 (rel. Dec. 13, 2012); 78 Fed. Reg. 1799 (Jan. 9, 2013).

Dear Ms. Dortch:

The U.S. Department of Justice (Department) submits these comments in response to the Federal Communications Commission (FCC)'s *Further Notice of Proposed Rulemaking*, Facilitating the Deployment of Text-to-911 and Other Next Generation 911 Applications; Framework for Next Generation 911 Deployment, PS Docket No. 11-153, PS Docket 10-255 (FNPRM). In particular, the Department is responding to the FCC's request in the FNPRM for comment on whether the default preference for a Public Safety Answering Point (PSAP) should be text-to-TTY delivery when the PSAP does not declare its text delivery option preference by a certain date.

Title II of the Americans with Disabilities Act (ADA) applies to State and local government entities and, in Subtitle A, protects qualified individuals with disabilities from discrimination on the basis of disability in services, programs, and activities provided by State and local governments. *See* 42 U.S.C. §§ 12131-32. Title II extends the prohibition on discrimination established by section 504 of the Rehabilitation Act of 1973, as amended, 29

U.S.C. § 794, to all activities of State and local governments regardless of whether these entities receive Federal financial assistance.  42 U.S.C. §§ 12131-65.  The ADA directs the Attorney General to promulgate regulations to implement the requirements of title II, except for certain provisions dealing specifically with transportation.  42 U.S.C. § 12134.  *See* 28 C.F.R. part 35.

The Department's title II regulation requires that public entities—including PSAPs—that communicate by telephone with applicants and beneficiaries use TTYs or another equally effective telecommunications system to communicate with individuals who are deaf or hard of hearing or have speech impairments—unless the entity can demonstrate that doing so would result in a fundamental alteration in the nature of a service, program, or activity or in undue financial and administrative burdens.  28 C.F.R. §§ 35.161(a), 35.164.  Accordingly, under § 35.161(a) of the current title II regulation, PSAPs must, *at a minimum*, use TTYs or other equally effective telecommunications systems to communicate with individuals with hearing and speech disabilities.[1]

The Department recognizes that many individuals with disabilities now use wireless text devices and the Internet, rather than analog-based TTYs, as their primary modes of telecommunications.  Our understanding from the FNPRM is that PSAPs may use existing TTY-based telecommunications systems to process text (SMS)-to-TTY calls.  Therefore, in fulfillment of their existing obligation to provide effective communication under title II of the ADA, PSAPs must accept a call from a person with a hearing or speech disability that originates as an SMS call, but reaches the PSAP as a TTY call.  A title II entity's obligation under § 35.161(a) to communicate using a TTY or equally effective telecommunications system is not contingent on how the call originates.  Accordingly, a PSAP that receives a TTY call must use a TTY (or equally effective telecommunications system) to communicate with individuals with hearing and speech disabilities regardless of how the communication originated, unless the entity can demonstrate that doing so would result in a fundamental alteration in the nature of a service, program, or activity or in undue financial and administrative burdens.  28 C.F.R. §§ 35.161(a), 35.164.

---

[1]It is important to note, however, that PSAPs have a greater responsibility to individuals who use TTYs (cited as Telecommunications Devices for the Deaf (TDDs) in the regulation) or computer modems.  For these users, § 35.162 requires PSAPs to provide direct access to 9-1-1 services and, thus, PSAPs may not require TTY or computer modem users to use relay services to call 9-1-1.  In its *Advance Notice of Proposed Rulemaking* on the Accessibility of Next Generation 9-1-1 services, the Department made clear its intention to maintain the direct and equal access to 9-1-1 services requirement for individuals with disabilities in any revision to its title II regulation. *See* 75 FR 43446 (Jul. 26, 2010).

The Department also recognizes that some PSAPs have upgraded their emergency telephone systems to incorporate an Internet Protocol (IP) system.  As such, some of these PSAPs may choose to use the upgraded IP system (or stand-alone IP-ready working station) to accept SMS-originated calls, but must still answer TTY-originated calls using a TTY.  If title II entities choose to accept SMS calls from individuals with disabilities through an IP system, the Department would consider that as using an equally effective telecommunications system; thus, such entities would be in compliance with § 35.161(a).

As noted above, the FCC in paragraph 145 of the FNPRM asked, "Should there be a default preference to ensure that PSAPs that do not declare their text delivery option by a certain date are then assumed to prefer text-to-TTY delivery, since that option should be available without further PSAP action?"  Based on the Department's analysis above, PSAPs are required under the existing title II regulation to accept TTY calls from persons with disabilities, even if they originate as SMS calls, subject to the established defenses of fundamental alteration and undue financial and administrative burdens.  The Department believes that the FCC's proposed use by wireless carriers of a default preference for non-responding PSAPS of the SMS-to-TTY delivery option would further the goal of facilitating PSAPs' compliance with the Department's implementing regulation pursuant to title II of the ADA.

Respectfully submitted,

Eve L. Hill
Senior Counselor to the Assistant Attorney General
Civil Rights Division